Ian Crosby from Sussman Godfrey for the Appellant and Cross Appellees, Zillow, Inc. and Zillow Group, Inc. This is a cross appeal. I would like to reserve half my time for rebuttal. And with that, I will proceed. All right. VHT's arguments on both sides of this appeal revolve around a central conceit, which is VHT would like to consider real estate photographs as if they were music files or MP3s, which are inherently subject to third-party claims of copyright, identifiable by artists and albums and publishers in metadata that's associated with them, that's necessary for them to be on their face with respect to who owns or creates them. Real estate photos are nothing like that. The lack of any similar claims to VHT's in this case is the dog that didn't bark. VHT had an opportunity to get discovery from Zillow to see if other photo studios were making similar claims regarding the same uses that Zillow was making with millions and millions of photos that it received from realtors and multiple listing services. There was no evidence of any such thing. I need a little help here at the beginning. You're surely not contending that photographs can't be subject to copyright? Absolutely not, Your Honor. And their photos are subject to copyright? They are, Your Honor. Right. And they took them for certain purposes. The photos are forwarded to you subject to the copyright agreement between the VHT and the sender? Absolutely, Your Honor. Okay. I want to make sure that you were not objecting to any of that. No, no, not at all, Your Honor. But VHT, they are subject to copyright, but they are unlike music files in cases like Grokster and Napster in that they are like a needle in a pile of needles. The ones that are subject to a third-party claim of copyright that is antagonistic to the rights that Zillow's ag providers grant to them or is asserted to be antagonistic look just like all the rest. There's been no claim, there's been no evidence in this case that any other photo studio has asserted that its license to its customers is inconsistent with the rights that those on to Zillow's system. Yeah, but so what? Well, so what it makes, it makes an enormous amount of difference for the issues of direct infringement and for the issues of secondary liability. And Judge Robart, who is here with us today, I think grasped that distinction when he granted judgment as a matter of law for Zillow on VHT's direct infringement claims respecting images that Zillow took no specific action towards and also for VHT's secondary liability claims with respect to images for which Zillow had received no notice in any form whatsoever prior to those images being loaded on its system and posted by its users to different areas of its website. Can we now break these up because there's multiple categories, I guess I would say. There are multiple categories. So are you talking now about the DIGS photos and the issues of direct and secondary or contributory liability? So the direct infringement issue spans both the DIGS photos as well as the photographs that were the subject of Zillow's summary judgment before trial. Listing platform. Zillow calls them home details pages, but the source. But basically this large group of photos that were available on its platform. Yes. Zillow's. So can we break those up, please? So as to the summary judgment that Judge Robart granted on those photos, your position is? So the issue is essentially the same, right? So Judge Robart understood the Volitional Act doctrine as articulated in Justice Scalia's dissent in Ariel, which this court has favorably quoted in Amazon and Giga News as boiling down to whether an action was taken that was specific to a copyrighted work. Selection is the classic example, but it really boils down to did the actor do something with respect to this particular work. And in both the cases of the listing images of the home detail page images and the DIGS images, there was never and there is no evidence in the record whatsoever that Zillow ever took an act that was specific to any of those images that resulted in an infringement. The ones for which Judge Robart granted judgment either by summary judgment or judgment as a matter of law. So in the case of the DIGS images, Zillow's website automatically received and processed in exactly the same way every image that every realtor multiple listing service sent to it. Those realtors multiple listing services, they chose what photographers they were going to hire. They chose what images to load into their listings and they also chose what rights to grant to Zillow to those images or at least to tell Zillow that they had and warrant to Zillow that they had. And when those images were received on Zillow's site, during at least some period of time, there was essentially a mechanism as part of Zillow's image processing system that would create versions of those images that corresponded to different resolutions on Zillow's website so that when somebody then looked at a page that needed an image to be displayed at this size or in this proportion, that that image would already be there. And after a while, Zillow realized that that wasn't necessary, that the processing of its computers was fast enough, that it didn't need to do that anymore. But to the extent that that generation of those copies could be deemed an infringement, we believe it can't because I think it falls clearly into the caching cases. But even if it could be deemed an infringement, and Judge Robart never reached this issue, that that was caused by Zillow's providers uploading them to Zillow's website in the There's a set that's searchable. Zillow moderated some of these images, and Zillow personnel clicked on this image and says, we're going to put this in a set that people can search. That's a small portion of the images in this case, and Zillow has not appealed the finding of direct infringement for display of those images in this case. But for all the images, the creation of these, again, these copies, there were also copies that were created corresponding to resolutions on digs at the time that users posted these images. And all of those images were created in response to user interactions, and again, Zillow played no role in selecting which images users chose to save in this way. So in both instances, there's no act towards a specific photograph that Zillow took that resulted in any of those copies being made. And similarly, to the extent that once those images were placed on individuals' non-searchable saved pages called boards on You see, that's, I don't want to stop your roll of explanation, but you know, there's a lot of different photos here in a lot of different categories, which I thought I understood until you started your argument to make them all one thing. So, you know, and maybe that's how you want us to think of it, it's either an up or down proposition, but as I look, if I look at these and I look, I think Judge Robart was carefully trying to put things in different boxes for good reasons because they could be categorized in different ways. So let me just ask you, with respect to the Diggs photos, the, those that were displayed and searchable, my understanding was that Zillow said, yes, you know, we had the volitional conduct of tagging these so that they would reside in a searchable cache, or not cache, but in a searchable form. And then the question on those photos, for example, was, but is that fair use? Is that a misunderstanding? That's correct. So Zillow has not disputed that a prima facie case of direct infringement has been made for those photos, and specifically because there was an action by a Zillow moderator that changed the availability of that photograph, and Zillow chose not to dispute whether any subsequent display was caused by that act. But if the Court accepts this fundamental distinction that a volitional act requires an action directed towards a specific work, then those are the only works in the case where arguably any act, any infringement can be traced causally back to an action by Zillow. Those meaning the Diggs displayable and searchable? Displayed searchable images, correct. And then they would move to the typical fair use analysis of those? Correct, with respect to the searchability. So your appeal on those has to be that it's fair use. They, of course, say it's not fair use. Right. And I think that the fundamental – And that's a small number of these. It is, although they are significant because they were subject to – Almost 4,000 of them. Yeah. I mean, everything is relative. But they're significant because they were the subject – and I'm getting into my rebuttal time, but I'll keep going – they're significant because they were the subject of a statutory damages award that was enhanced for willfulness. Okay, so that – so now – okay, now we're breaking it apart, and that's what I thought you were getting to, and that is that on these overall Diggs photos, Judge Robart upheld willful liability for some 2,700 – willful conduct for some 2,700 photos. Correct. He did. And would you then restate your position on why willfulness is not a proper finding based on the record here? Sure. So willful infringement requires an intent to infringe, and that intent to infringe can be shown by evidence of actual knowledge of the infringements or by recklessness or by willful blindness. Now, Judge Robart did not find actual knowledge. There was no actual knowledge. He also didn't address recklessness. He found there was willful blindness. Willful blindness, under Ludvart's opinion and others, lets – lens – requires not only a subjective suspicion of a high likelihood of wrongful conduct, but affirmative actions that were taken to avoid learning about it. Let me read to you from testimony from Kristen Acker. It's SCR 80. You may be familiar with it. The questioning is related to when the same photo comes in from two different sources. One source says it's subject to an agreement with VHT that makes the use limited. I think deciduous is going to be the vocabulary. The other source says it's evergreen, that is to say continuous usage, so that depending on which one of those you believe, you either can use it or not use it. Apparently, Zillow's, quote, trumping rules say that the more expanded use is what they do and then question, does Zillow do anything to investigate why one source, one feed gave you those rights with respect to those photos and the other did not? Not so far as I know. Zillow just relies on the representation that are made in the agreements. Is that correct? Yes. In other words, that sounds as though you're on notice that there's a problem and you choose the one more advantageous to you without further inquiry. Well, is that not willful blindness? So there was, I think, in the statement of her testimony and specifically was that the rights from the different feeds were rights from VHT. The different rights that determine the trumping order are the ones that are specified in the agreements that Zillow has with the provider. There's no reference to VHT or any third party. And Zillow receives feeds from both listing services, individual realtors, and aggregators. And so with respect to an individual photo, the same photo may come to Zillow from three different sources. And so the difference relates to the rights that the individual provider has for that photo. So, for example, if the realtor is the one who took the photo, they might own the copyright in that photo and be the higher trumping one. And so we generally, and I think there's testimony elsewhere in the record on this, that the trumping rules go by essentially who's closest to the listing and gives priority to the permissions that the person who's closest to the listing to the actual taking of the photo. So no, it doesn't indicate, there's nothing intrinsically about that decision that relates to copyright or knowledge that trumping, you know, when I get the photo from the realtor and the realtor says you can keep it up and the MLS says you can't, that keeping it up because the realtor said I could even though the MLS said I can't, there's nothing about that intrinsically that indicates an intent to infringe a copyright. And Judge Robart also did not find that that had any such implication to it. So the willful blindness, I mean, he didn't really address the other two aspects of it. But he attributed the willfulness to basically see no evil, hear no evil, right? And that's right. And what this court said in Ludvart's is that simple, that indifference is not enough. That willful blindness requires an affirmative act to not learn. And Judge Robart's opinion for that specific point of what Zillow did to keep itself in the dark cites omissions, basically, that it didn't follow up, that it didn't learn. But if you, Ludvart says that's not enough. You need to have an affirmative act to avoid learning. And there's nothing in the record that indicates that. In fact, the opposite is true. When ZBHT came with its claims, Zillow responded by asking for licenses, asked to say, who are the, who are your customers? I mean, there was that correspondence and they wanted more information. And ZBHT dropped it, never provided Zillow with the information. And it turns out that the representative license that it gave Zillow was not constant across all of its users. There are, in fact, some ZBHT customers to which it assigns copyrights or gives exclusive rights to. So although that is, the contract is typical, it's not uniform. And my understanding, when you wrote back and when you checked the specific photographs cited to you by ZBHT, a fair number of them, like maybe 30 percent, really didn't correspond. Well, I mean, the information that ZBHT gave to Zillow was addresses. And so, you know, an address could have been reshot by another, by another realtor. It just gave them addresses of properties that they had shot at some time in the past. And so Zillow looked at that and said, you know, at least 30 percent of these properties are, you know, either still on the market or they're scheduled to take the photos down when it comes off the market, which still doesn't show that the ones that were not in that 30 percent actually were ZBHT photos. So this goes to, but again, because so few of the photos at issue were the subject of that notice, the trial didn't really go into, you know, how sufficient that notice was in terms of providing knowledge to Zillow. But all the rest of the images in the suit were not subject to any notice that is actually in the record, was in the record before the jury on this case. The record on appeal includes many complaints with listings of images that were generated after discovery happened in this case. But in terms of actual notices to Zillow during the time period in question, that's the only one. It doesn't concern very many of the images. It really is, as under low blue bars, would be general notice at best. Thank you. I've lost it. We'll give you some additional time because I'm sure that BHT will take some additional time. Thank you. May it please the Court, I'm Steve Rumage and I'm appearing this morning on behalf of the plaintiff and appellee BHT. And I listened very carefully to Mr. Crosby's argument and there was one word I kept listening for that I never heard and that was jury. We had a jury trial here and so a lot of these factual issues that Mr. Crosby raises are actually issues that the jury heard about, that the jury decided. The jury was properly instructed on every issue that you just heard about. No contest as to instructions about willfulness or fair use or the like. And the jury came back with an award finding that Zillow had infringed copyright as to 28,125 copyrighted BHT photos. So we're here today really to stand up for that award in all of its entirety. That is not only as to what Judge Robart affirmed, essentially adopted and entered judgment on after the post-trial motions, but also the portion of the jury verdict that he set aside which we believe should be restored. So in the time I have, what I want to cover is this. First I want to talk about the volitional conduct requirement because that's an issue that cuts across a big swath of this case. It's what was principally relied upon by Judge Robart in setting aside the verdict as to most of the images that were the subject of the jury's verdict. And it was also the principal basis, the sole basis really, for summary judgment as to the listing site claims, which I believe Your Honor was talking about with Mr. Crosby at the outset. Is he called the home retail? Home details page? Yes. Yes. Home details, listing platform. Yes, exactly. So those are the summary judgment rulings that Judge Robart made. Then I want to turn to, I guess I'll turn next to willfulness after that because that was the subject of some discussion with the Court. And then I want to talk briefly at the end about VHT's request that the Court at least, at the very least, if it doesn't reverse on volitional conduct, restore the jury's verdict as to the 1,694 photos that Zillow made searchable but as to which the jury's verdict was vacated. So let me turn first to the volitional conduct issue. And I'll do that in a slightly different order than Mr. Crosby covered it, just because I think it's analytically easier to do. I want to first talk about it in the context of the award that was set aside, the verdict that was set aside, and then in the context of the summary judgment that was granted by Judge Robart. So obviously any discussion of volitional conduct in this circuit has to start with Giga News because it is the most recent case on the issue. It also is the case that most explicitly adopts volitional conduct post the Supreme Court's decision in Aereo. Now Giga News involved Usenet. I'm not particularly familiar with the Usenet, but I went back and looked at the briefs in Giga News to understand it better. And that's a situation where users are the sole source of the content on the site. Users upload articles. The servers of Giga News essentially serve as a receptacle for the upload of the articles. And because of the nature of the Usenet, where peers share what is on their various servers, what's uploaded by users gets shared. That's the essence. What this court decided in Giga News was that all Giga News had done is set basic parameters for users to upload. It did not select, and I quote, any of the content available on its servers. It did not tell anyone, quote, what to upload, close quote. And it, quote, quickly removed, close quote, infringing material when it received specific notice. So the court found, okay, Giga News in those circumstances is nothing more than a passive host. And that's a quote. Merely a passive host. It did not play any sort of an active role, again, a quote. No evidence that it, quote, exercised control, close quote. Therefore, this court concluded, it was not the causative factor in the upload of those images. Because it was not active, it was not directly liable. Its liability would have to be analyzed under the rubric of secondary liability. So the question is, what are the facts here? And remember that when we think about the facts here, we have to think about them in the context of trying to sustain the jury's verdict. Because when you get a jury verdict, you have to indulge every inference in favor of that verdict. So here's what the jury could have found. The jury could have found that Zillow had this listing site with the home details pages and the likes. And that when it decided to start this digs part of its website, it went to that listing site and it put a save button on every single image that it had on the listing site. And it told users, you can save this image to our dig site. In fact, actually, when you look at the evidence, the button just said save. It didn't tell users exactly what was going to happen if they hit save. It said save. And when you clicked save, something popped up and said, keep saving. Keep saving, said Zillow. And then when that button was pushed, what Zillow did is it made 16 copies. It didn't just save the image for the user. It made 16 copies, which then according to its protocols, which you can find at ER 250, it made different size copies for different purposes that Zillow had, not purposes of the user. It decided, as Mr. Crosby acknowledged, whether to make those searchable images or not. It decided how to crop the images. It decided which ones were going to be available for public display, which ones would be available for private display. Those were all decisions that it made. And then images could be viewed for the vast majority, over 19,000 could be viewed on people's private boards, or if they were searchable in addition, they could be viewed by members  of the public. They could be viewed through searches, going through the website. And now after it's caught with these infringements, because there's no question on the record that there was an infringement of VHT's rights in these images, after it's caught, this volitional conduct offense amounts to this. Zillow is saying that who really infringed the copyright, the real primary infringer is the user who clicked save. That's the essence of their argument, because the nature of the volitional conduct requirement, as Justice Scalia explains in Aereo, is a channeling function. You channel somebody either towards the rubric of primary liability or secondary liability. And if you're channeling towards secondary liability, because you find that they were not the cause of the infringement, what you are in essence saying is somebody else is the primary infringer. I guess I don't read the argument that way. You go all the way through up to where you say, well, it's somebody else that's the infringer. Well, there's an infringement. We know there's an infringement, right? Because that's settled as a matter of fact. Well, it depends on which photos. No, actually, all 28,000. There's an infringement. There's no question of that, because the jury found that there is no error assigned to that finding. They are assigning error to volitional conduct, which is a question of who is the cause. Correct. Because that's what Giga News really says. This isn't about motive. It's about who's the cause. So the question is, is Zillow the cause or is the user the cause? And I think, Your Honors, that the jury who we give these questions to was entitled to find that the entity that put that save button there, the entity that decided to make 16 copies, the entity that decided to crop them for its own use. I mean, this is not a situation where those 16 copies went to the user. Those 16 copies were used by Zillow in its business to create a website. It's as if in Giga News, Giga News didn't just take the article and put it on its server and allow its peers to access it. It's as if Giga News said, this is a good article. We're going to make 16 copies of it. And if we like it enough, we're going to maybe put it in a prominent place on our website. Let me ask you with a little more granularity. Sure. On the images that were not displayed. Yes. And a small amount of those were searchable, but they were not displayed. What is your argument in terms of volition and in terms of which copyright right was being infringed? All right. There are a lot of things actually embedded into what looks like a simple question. I understand that. Okay. All right. That's why I'm asking you to explain it. Well, let me break them down. So, first of all, the first thing that's embedded in there is the images that were not displayed because the reality is we don't actually know. There's a stipulation in the record, and that's obviously a subject that we may have to get to, that your honors may have to get to, and of course they're deciding this. The stipulation says that there's a particular spreadsheet that was Exhibit 512, and it said you have to take every fact on this spreadsheet as true. As to display, the quote, fact, close quote, was that in column AW, it had the heading display and then it had one of two values, Y or N. Now what did that mean? Testimony at trial established what it meant. The testimony at trial established that Zillow only recorded, well, back up, the testimony first established that what that meant was that Zillow had recorded a display, yes or no. What did Zillow record the display of? Images on the image details page. What that meant is not that the image had been displayed, but that after it had been displayed somebody had clicked on it to get the crisper, bigger image. So they did not record all displays. So to answer your first question, your honor, we don't know with granularity how many images were displayed. We believe the jury was entitled to infer that every image was displayed, right, because the evidence was there were, you could be displayed on search pages, you could be displayed on the landing page. You could be. So what good was the exhibit that the jury was told to accept as the facts? Because it provided whatever data was available on that topic. The jury knew for certain. Right. But then the jury told to look at that exhibit, to accept it as fact, and it was a stipulated fact. You're now saying, but they could have disregarded that and found other evidence. Oh, no, absolutely not, your honor. They could not have disregarded that. In the sense that they could not have found that fewer images than what was shown on that spreadsheet were displayed because everybody conceded that Zillow had kept a record showing that those had been displayed. But the testimony that that was incomplete came in without objection. Nobody objected when the question was asked about the other ways in which images could be displayed. And particularly, your honor, it seems clear that one, that a jury could properly conclude that those images that Zillow tagged as searchable, because they thought they were really good, were likely to show up in search results. And so I think that at least as to the 1,692 or 94 searchable images as to which judgment was granted against my client, those should be restored because those, I think the evidence is pretty clear that the jury could have concluded they had been displayed. And I'll be honest with you, your honor, I know you asked a lot of things in that question and I think I've answered part of it and I can't remember the rest of your honor's question, but. You've answered enough of it. Okay. All right. I appreciate that. So the bottom line on the volitional conduct thing as respects the aspect of the district court's order throwing out part of the verdict, this case is not like those passive copy shop cases. That's the typical metaphor that's used in the case law by the Supreme Court, by courts of appeals. Because that talks about somebody who walks into a copy shop with infringing content, puts it on the plat and makes a copy and leaves. This is a case where somebody walked into a copy shop and Zillow had given them a menu of the things that they could click save on. And then when somebody clicked save on it, Zillow posted a copy like people wanted on their board inside the digs website, but then they took 15 extra copies for themselves, which they trimmed and shaped and used for their own purposes. So this isn't the copy shop. It doesn't fit. This is more like the Aereo case or the MP3 tunes case or the perfect 10 versus Amazon, which talks about Google. All of which found that even though conduct by a website or a provider, even though it was quote automatic, even though it was automatic, that the site itself was the animating cause. It was engaged in volitional conduct. They answered this by your argument that you think it's the site itself. But then there's the other category of photos. We've been talking now about your 1,600 and some photos that were displayed, carve out that were displayed. Yeah. Which were searchable. Exactly. Which were searchable, but not displayed, or at least depending on how you. They were not on the stipulation. No. Yes. Understood. You're on it. D. But then there's the other images which are displayed, but they're not searchable. So you can't put a little button on those as you're putting it. So what? Well, actually there was a button. They got there by the user clicking that button. And even though Zillow chose not to make them searchable, it still engaged in the same process of making 16 copies and trimming those, because bear in mind, those 16 copies are not 16 identical copies. If you look at ER 250, they are each sized differently, and there's directions as to how you crop each of those 16 copies. Because what they did is they made those 16 copies and trimmed them for every use they could imagine, and then later decided whether to make them searchable. So they essentially. And for those that they did not make searchable, what happened to those? Those went to people's boards. So if your honor had an account on Zillow and you clicked save, that would go to your board. And that board, and let's say your real estate professional. But they get only to the person who clicked save? No. They're publicly available, but they're not going to show up in search results. So somebody will see them if they decide, oh, I want to see what Judge Fletcher likes. And they go to your page. They'll all be there unless they're marked private. And a very small number of these images were marked private. And the jury saw a summary of that. So that's a distinction. And could people have gone there? And my page is automatically available to the general public? Yes, it is, unless they're marked private. Unless they're marked private. Exactly. And remember that a lot of these pages are not Judge Fletcher. What they are is real estate broker or interior designer or contractor. And so the whole purpose, indeed, there's testimony that Zillow sold this to people as saying millions of people will put eyeballs on your page and see the images you save. So there was an intent to drive traffic to those. If your honors have no more questions on that specific topic, I wanted to talk briefly about the summary judgment order and how volitional conduct figures in there. And could you make sure to get to the willfulness question? I think I'd better make sure in light of that, your honor. Let me spend a minute, if your honor is okay with that, on the summary judgment, and then I will go to willfulness. As to the listing site, it's important to understand there that it's a situation where the listing has expired, and so the VHT license no longer authorizes the use of the image because it only authorized the use of the image while the listing is up and live. And so the question is, when the image stays on the site after the listing dies, after the property is sold, does Zillow engage in volitional conduct that causes it to stay on? And the answer to that is that when the property is sold, Zillow decides what image to display because if the rights on the listing site, as shown, are deciduous, what Zillow does is it takes them down and then it looks for evergreen rights for the same property. That's what the testimony shows. And then it would make the choice to restore those evergreen rights, those images that may have been from a prior or even a simultaneous listing, to the site. It was on notice, beginning in 2014, that its continued display of those images violated VHT's rights. In January of 2015, and I think the sequence of this got a little bit messed up and we'll talk about it in willfulness as well, in January of 2015, VHT gives Zillow its license, its form license, and says, see how it expires. And contrary to what Zillow says, the jury was entitled to find that after that, Zillow basically did nothing. Audits showed that Zillow continued to leave up deciduous images as if they were evergreen. Were they traced to VHT's? No, because of course this was resolved on summary judgment, and so those didn't get to trial. Right. And so there wasn't testimony as to how many, if any, were traceable to VHT. Exactly. The point is that a jury could have found, could have found, that Zillow made the choice as to what was going to continue on the listing site, and so they are responsible in the sense of being direct infringers, not just secondary. Let's talk a bit about willfulness. Start with this. The jury was properly instructed on willfulness. Nobody denies that. The question is, were there enough evidence to support that? Exactly. And so it was a classic state of mind issue, so something that we particularly defer to the jury on. Now let's go down the evidence. The jury knew that Zillow had gotten repeated notices from VHT regarding infringement. The first one, which is what Mr. Crosby talked about, was in July of 2014, but those notices continued repeatedly in late 2014, 2015, throughout 2015, and after the suit was filed, they continued, right? Now, when you say, is that the first one, is that the July 10 letter? The July 10 letter, exactly. And then there's dialogue that continues until October. It kind of stops for a couple of months, and then in January 2015, VHT sends the license and says, here's our form license. Mr. Crosby acts as though, at that point, Zillow, or pardon me, VHT dropped the ball, but I want to read to you from ER 923, which is the email that went to VHT requesting the license, and it said, will you be able to provide us with executed versions of these agreements with each photographer and brokerage? And the implication that Zillow tries to draw on their brief is that, aha, we asked for executed licenses of every one. Here's the next sentence in that email. We do not need these today. Mr. Balduff, my client, says, yes, absolutely. There was never follow-up after that asking for executed licenses. We began providing lists of infringing images by URL, specifically identified by URL, in November of 2015. The jury had the spreadsheet that showed the URL number, that showed when they got notice of each one. By January of 2016, they had notice of over 15,000 infringing images specifically. The jury heard that they did nothing. And at what point is suit filed? Suit is filed in 2015. I can't remember the date. But how soon after this exchange of, please send us the executed licenses? They never do say, please send us the executed license. They say, can you provide them? And we said, yes. But, Your Honor, they said, we don't need them today. We don't need these today, but as I'm sure you can understand, we will need to see confirmation of these in the future. All they had to do was ask. It's a question of you don't interpret that as asking. No, and when Mr. Balduff responded, yes, absolutely, all she had to say was, well, then can we see them? But then that email was never sent. And I think, Your Honor, again, we're getting into the province of the jury. They could make the argument to the jury that, oh, no, that's not willful blindness. Because, look, we were responsive. But they heard a wealth of evidence, which I can't cover in these minutes because it was eight days of testimony. And they're entitled to look those Zillow people in the eye, listen to what they say, and look at the documents, and make a conclusion as to whether they were willful when they didn't take down. Again, remember, the jury never heard anything as to whether they ever took an image down. Could they find that was willful? Well, it turns out Judge Robart then took out 600 and some images which weren't displayed. So the jury had 3,000 some. And then it was reduced to 2,700. And that is not something that you've cross-appealed? Oh, yes, absolutely. And that's what we were talking about. But that 600 images you've cross-appealed? That 673 is embedded in the 1,692 that I was just talking about. Okay. Okay. Those are the images that were searchable. Because those are the display. Because the 673, the significance of that number is that of the 1,692 or 94, I never get that number right, those were the ones that were eligible for statutory damages, the 673.  And so it's a subset of the 1,692. Of the 1,672. All right. So I see I've gone over. I apologize. If the Court has any questions, I'd be delighted to answer them. I think not. Thank you. Thank you, Your Honors.  Why don't you put five minutes on the clock? We'll sort of add their time to his remaining time. So in 20 minutes, 22 minutes, we have not heard an identification of a single act that any VHT photo that has that issue. So I want to go talk specifically about these listing pages because there was, I think, some confusion about what might be relevant here or not. So there was the rules by which Zillow kept listings up or not depended on what the providers had specified for those images. But they were applied uniformly to all of the images that any provider provided. And to the extent that it's even arguable, and it's not, that the processing had some sort of nefarious purpose, that's not at issue because there was no secondary liability claim brought with respect to the home images, to the listing images. The only question is the volitional conduct question. And as this Court has said, it doesn't depend on intent, has nothing to do with intent. It's just causation. Who is the person who took an act that's specific to this work that caused it to be infringed? And any further liability beyond that person must be established through secondary liability. That's the sorting mechanism for which volitional conduct exists. So similarly, with respect to the dig sites, the allegedly volitional conduct was putting a button on every image. Those were the words. I wrote them down as they came out. Again, this is the central conceit that VHT's images are representative of what's on Zillow's website. Millions of images on Zillow's website have never been subject to any claim of an adverse rights holder. And there's no reason to doubt that the rights that Zillow's providers guarantee to those images are, in fact, the images that Zillow has. In fact, all the evidence suggests that those are valid rights. Otherwise, why are there no complaints? Well, with respect to the willfulness, there's probably different ways you can read the chronology, but the way your colleague reads it is you sort of ask, but then you said, never mind, and then the suit gets filed. And so it was then proceeding without the concrete evidence of the license arrangements. So two things. First of all, the words, again, I wrote them down out of my mouth, was Zillow basically did nothing. Under lieu of arts, basically doing nothing, quote, unquote, indifference to a claim of copyright. It is not sufficient there. Willful blindness requires an affirmative act to avoid learning something. Second. Well, affirmative act is somewhat ambiguous, but it's you asked for something and then according to his version of the evidence, you said, no, actually, I don't need it. That evidence that you decided you didn't need actually would have told you something that would have been adverse to your client. That is not what the evidence shows. So tell me what the evidence does show. ER 923 is an email chain. The second to last email is from Michelle Wynn from Zillow. She asks for the agreements with photographers and brokerages. She says, I don't need these today, but I'm sure you're going to say, well, we'll need to see confirmation of these in the future. And then Brian Balduff, the CEO of VHT, responds, hi, Michelle, yes, absolutely, thanks, Brian. That's the final communication. We asked for them. We said, don't need them tomorrow, but we need them in the future to resolve this. And he responds, and this is the last word in that chain, yes, absolutely, I will give these to you. And he never did. We never heard from Zillow. And then how long after that was the lawsuit? So this was January 2015, and I don't have the exact filing date, but it was, I think it was a year, maybe? I think it was a year before they filed suit. I'm sorry, it was January 2016 that they filed suit. And when they did file suit, the complaint had on it a very short list of images with URLs for some, this was the first time we actually had locators that were on Zillow's website. They're not actually the locators that Zillow needs to process the images and take them down. Those only came after discovery and a very complicated process, which resulted, and it's the final thing, if you're honest, the stipulation. That stipulation, that was a deal, okay? It relieved VHT of the burden, its burden of proof, to prove that certain images had, in fact, been displayed. And the generation of the yeses, of the whys in that column, and it said displayed, was a very complicated process. And proving up why, and proving the fact that these images were displayed would have been a difficult thing for VHT to do. So they made a deal. We stipulated to those images having been displayed, and in exchange, Zillow got a stipulation that other images had not been displayed. The column said Y and N, and in fact, an earlier version of that spreadsheet came back from VHT with Y and U, and Zillow insisted on Y and N before agreeing to that stipulation. But the stipulation is interpreted in this court like a contract. And so the stipulation, when it is clear on its face, it is not to be contradicted with subsequent testimony by witnesses who were not parties to bargaining, to agreeing to that stipulation. Do we attach any importance to the fact that the testimony came in without objection? No, not at all, Your Honor. So the testimony came in, and there is no need to object to testimony that is irrelevant. But at the time that we went to oral argument, in fact, Zillow did object. Zillow said, you know, we are afraid they are going to go somewhere. This is at SER 167 through 169. Zillow says, we are afraid they are going to invite the jury to speculate that these images that were stipulated as not being displayed were displayed. And Judge Robart says, well, I am going to allow the argument if they want to make it. I assume that you are going to respond to it. I don't expect to hear a rebuttal, and you are free to rip it apart if you think you can rip it apart. There is a jury instruction. And then Ms. Paul, counsel for VHT, interjects and says, that is not what we want to introduce this for. She says, I just want to respond briefly so that Your Honor understands the context. This goes to our making available argument. So she disclaimed that they are going to try and use this to contradict the stipulation at the time that Zillow objected to them doing just that, going into closing argument. Thank you, Your Honor. I appreciate it. Thank you. I thank both counsel for a very interesting and complicated case and for your briefing and arguments. The case of VHT v. Zillow is submitted.
judges: McKeown, W. Fletcher, Gould